## APPEAL OF FREDERICK H. HOFFMANN.

Docket No. 3361. Submitted July 30, 1925. Decided February 23, 1926.

Upon the evidence, *held*, that the taxpayer made a *bona fide* gift to his wife of certain stock and that he derived no taxable gain from the subsequent sale of said stock by his wife.

*Hugh Satterlee* and *Roy M. O'Hara, Esqs.*, for the taxpayer.
*Willis D. Nance* and *E. C. Lake, Esqs.*, for the Commissioner.

Before IVINS and GREEN.

This appeal is from the determination of a deficiency in income tax for the year 1919 in the amount of $661,996.74, and arises from a transaction which the Commissioner contends constituted a sale of stock by the taxpayer at a profit.

### FINDINGS OF FACT.

The taxpayer is an individual residing in Weehawken, N. J. During the early part of 1919, and for over 25 years prior thereto, he was engaged with Arthur Zinn and Martin Zinn in the manufacture and sale of Gem safety razors and razor blades. Arthur Zinn and Martin Zinn were also during the same period engaged in the metal novelty business, under the name of Simon Zinn, Inc., in which the taxpayer has never had an interest. Throughout the taxpayer's connection with the Gem safety razor business it was conducted under his active management, said Arthur Zinn and Martin Zinn devoting their major attention to their metal novelty business.

For some years the Gem safety razor business was carried on by the taxpayer and Arthur and Martin Zinn as a partnership. On or about January 1, 1913, a corporation was organized, under the name of the Gem Cutlery Co., to sell the Gem safety razor products, with a paid-in capital stock of $10,000. Later, and in or about the year 1915, the taxpayer and his associates caused to be organized the Superior Safety Blade Manufacturing Co., Inc., with a capital stock of $2,000, which carried on the manufacture of safety razor blades

for the Gem safety razor and manufactured some of the other parts. Thereafter, and until the taxable year here in question, the business was carried on through the medium of these three organizations.

On or about January 8, 1919, the Gem Safety Razor Corporation was incorporated under the laws of New York, with an authorized capital stock of $250,000, but no property was at that time transferred to that corporation and none of its stock was issued.

On July 21, 1919, the taxpayer had an informal conference with one Storm, representing those persons who subsequently formed the American Safety Razor Corporation, and at that conference Storm suggested to the taxpayer that the interests which he represented were desirous of acquiring the interests of the taxpayer and the Zinns connected with the manufacture and sale of the Gem safety razor, and asked the taxpayer to arrange a conference with his associates for the purpose of considering an offer which he was prepared to make.

Thereafter, on July 22, 1919, a conference was called at which there were present the taxpayer, Martin and Arthur Zinn, one Stern, counsel for the taxpayer and his associates, one Dammann, counsel for the proposed American Safety Razor Corporation, one Bennett, also of counsel for those interests, Kaufmann, who became the president of that corporation, and Storm, the promoter of the plan. At that conference, Kaufmann and his associates offered to pay $4,000,-000 for the Gem safety razor business. The taxpayer at that time indicated that the price was satisfactory to him. It developed, however, upon discussion of counsel, that a very heavy tax, amounting for the three individuals to approximately $2,000,000, would result from such a sale, and the taxpayer's associates immediately stated that they would not make a sale which would produce such a net price to them, and in that decision the taxpayer acquiesced. Thereupon, one of the conferees suggested that if the taxpayer and his associates made a gift of their interests in the business to their wives and their wives consummated the transaction, and the gifts were made in absolute good faith, and the taxpayer and his associates never received the proceeds of the sale, no tax would result, except possibly upon any increment of value between the value at the date of the gift and the sale price.

The taxpayer had been in ill health for a considerable period of time and was desirous of terminating his association with the business and retiring. He had in addition to his interest in this business a fortune of $700,000 to $800,000. His wife was concerned about his physical condition, and was exceedingly desirous that he retire.

On July 23, the taxpayer, upon arriving at his office, was informed by his brother, who was the office manager of the Gem safety razor

business, that he proposed to quit and go to Florida. In the then state of the taxpayer's health, this announcement greatly upset him, and he returned home in a condition approaching mental and physical collapse, and went to bed in the middle of the afternoon. Upon arising, he informed his wife that he had determined to turn over to her his interest in the Gem safety razor business to do with as she wished, and that he intended to retire. On the day previous he had reported to her the substance of the conversation with Kaufmann and his associates in respect of the proposed sale to the American Safety Razor Corporation.

On July 23, 1919, the taxpayer and his associates caused the authorized capital stock of the Gem Safety Razor Corporation to be increased to $1,100,000.

On July 24, the taxpayer, upon arriving at the office, announced to his associate, Martin Zinn, his intention of giving his interest in the business to his wife and retiring. Martin Zinn protested that he, Martin, did not want to retire, and urged the taxpayer to take a long vacation to recover his health and to go on with the business. The taxpayer was obdurate. These conversations were renewed on July 25, and Martin Zinn called his wife on the telephone, when she asked him to bring the taxpayer to their summer home on Lake Placid, where she then was. The taxpayer left that night with Martin Zinn for the Zinn home at Lake Placid, arriving there early Saturday morning, July 26. In the meantime, Arthur Zinn had departed for his summer home at Bethlehem, in the White Mountains.

On July 26, upon his arrival with Martin Zinn at their home, the taxpayer was met at the station by Mrs. Zinn and the conversation immediately was centered upon the proposed retirement of the taxpayer. Mrs. Zinn added her urgings to those of her husband that the taxpayer take a long vacation but remain in the business. These conversations continued through the greater part of the 26th. In the evening, finding that the taxpayer would not alter his determination, Martin Zinn announced his intention also to turn his interest in the Gem safety razor business over to his wife, and thereupon called Arthur Zinn over the phone at his home and communicated his determination to him, and Arthur Zinn at that time stated that he also would make a gift of his interest in the business to his wife.

On Sunday night, July 27, the taxpayer and Martin Zinn left for New York, arriving Monday morning, July 28. On that day they and Arthur Zinn subscribed for, and there was issued to them. $975,000 par value of the stock of the Gem Safety Razor Corporation, and they paid cash therefor. On July 29, $125,000 par value of stock was issued to the taxpayer and his associates for the transfer to the Gem Safety Razor Corporation of the stock of the Gem Cutlery Co. at a valuation of $15,000; the stock of the Superior

Safety Blade Manufacturing Co. at a valuation of $45,000; and for machinery belonging to the partnership at a valuation of $65,000. Immediately thereafter the Gem Safety Razor Corporation purchased for cash from the taxpayer and his associates the good will of the business, the sole remaining asset of the partnership, for $975,000.

Thereafter, on July 28, the taxpayer and his associates had instructed Stern to take all necessary legal steps to carry into effect the transfer of their interests in the business to their respective wives.

On July 29, the taxpayer endorsed and delivered to his wife all the stock certificates in the Gem Razor Safety Razor Corporation theretofore issued to him, reserving one share to qualify himself as a director. Each of his associates, Martin and Arthur Zinn, pursued the same course, and thereupon the certificates theretofore issued to each of them and so indorsed and delivered were turned back and new certificates of stock were issued to the respective wives. At the same time each of the three executed a separate assignment of his stock to his wife. The certificates so indorsed by the taxpayer and the new certificates issued in lieu thereof were delivered to Mrs. Hoffmann and were by her indorsed and delivered to Stern.

On August 5, Mrs. Hoffmann, Mrs. Tessie Zinn, wife of Martin, and Mrs. Florence Zinn, wife of Arthur, entered into an agreement with the American Saftey Razor Corporation for the sale of their stock and interest in the Gem Safety Razor Corporation for a consideration of $4,000,000, $250,000 to be paid upon the execution of the agreement and $3,750,000 to be paid at a later date, in default of which payment the initial $250,000 was to be forfeited. On August 12, payment of the first $250,000 was made and delivered to Mrs. Hoffmann, who deposited the same in her bank for the account of herself and the associate wives, and with these funds purchased United States Treasury certificates. On or about September 22, 1919, the American Safety Razor Corporation made a final payment of $3,750,000 to Stern, who delivered $1,250,000 to each of the three wives, including the wife of the taxpayer, who received it and has ever since retained it or the investments or reinvestments into which such payments were converted. At the same time, the American Safety Razor Corporation entered into separate agreements with Emma Hoffmann, Tessie Zinn, and Florence Zinn, whereby it agreed to indemnify each of them "upon being notified in writing * * * within six years hereof of a final decision or decisions of the United States Treasury Department levying and assessing * * * a tax in excess of $133,333.33 * * * up to $533,333.33." At the same time Hoffmann and his

associates entered into an agreement with the American Safety Razor Corporation not to engage in the safety razor business for a period of 10 years from and after the date of that agreement.

In his income-tax return for the year 1919, the taxpayer reported as gain or income $16,000, being the difference between the par value of the stock of the Gem Safety Razor Corporation ($20,000) received by him in exchange for the stock of the Gem Cutlery Co. and the Superior Safety Blade Manufacturing Co. ($4,000), previously owned by him, but reported no gain, profit or income of any other sort arising out of the above-mentioned transactions or any of them.

The Commissioner, in the audit of the taxpayer's return, and as a basis for the deficiency here in issue, asserted that the taxpayer derived a profit from the sale of the stock of the Gem Safety Razor Corporation to the American Safety Razor Corporation in the amount of $966,666.67, being one-third of the difference between $1,100,000, the par value of the stock of the Gem Safety Razor Corporation transferred by the taxpayer to his wife, and by her to the American Safety Razor Corporation, and $4,000,000, the price received therefor.

## DECISION.

The deficiency determined by the Commissioner is disallowed.

## OPINION.

GREEN: This appeal is one of three arising from the Commissioner's determination that this taxpayer, together with Arthur Zinn and Martin Zinn, realized a taxable gain at the time the American Safety Razor Corporation acquired the stock of the Gem Safety Razor Corporation.

The Commissioner asserted the deficiency upon the theory that the gifts of stock of the Gem Safety Razor Corporation, made by the taxpayer and Arthur and Martin Zinn to their respective wives, were not *bona fide* gifts and that the sale of the stock was in fact made by the husbands to the American Safety Razor Corporation with a consequent taxable gain to the husbands. The Commissioner determined this gain to be the difference between the par value of the stock held by the taxpayer in the Gem Safety Razor Corporation and the price at which it was purchased by the American Safety Razor Corporation.

Only one issue was raised by the petition and answer. That issue was whether the gifts were *bona fide*. All of the proof was directed toward this issue. No evidence was introduced which would serve as a basis for the determination of a taxable gain from any other transaction.

In cases of this type, all of the circumstances surrounding the questioned transaction are and should be subjected to the closest scrutiny. It is difficult indeed to distinguish between cases where the parties have acted in good faith and cases where they have not acted in good faith. This difficulty is due to the close relationship of the parties and to the fact that they may have had verbal agreements or understandings which are unknown to the Commissioner and which they refuse to disclose on the witness stand. Such cases arouse a suspicion as to the *bona fides* of the transaction. That is the case here. The entire record in this appeal has been examined and analyzed with unusual care by every member of the Board. We have tested it from every angle which the record will permit and we find therein nothing to warrant us in holding that the transfer of the stock by this taxpayer to his wife was not a *bona fide* gift, vesting in her unconditionally every right of title and ownership which the taxpayer had. It was not a gift of the proceeds of the sale. No contract was made by the taxpayer and his associates for the sale of this stock. The sale was made pursuant to a contract between the wives and the American Safety Razor Corporation. Upon the issue presented, we must find for the taxpayer.

There is in this record no proof which would warrant any conclusion on our part as to the amount of the gain or loss, if any, realized or sustained by the partners on the transfer of the assets of the Gem Safety Razor business to the Gem Safety Razor Corporation.

On reference to the Board, ARUNDELL did not participate. KORNER, MARQUETTE, SMITH, and TRUSSELL dissent.